IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN M EHRINGER ENTERPRISES INC. d/b/a DATA CENTER SYSTEMS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. **3:06-CV-812-L** |
| MCDATA SERVICES CORPORATION, f/k/a COMPUTER NETWORK TECHNOLOGY CORPORATION, | § § § § § | |
| Defendant. | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the court is the Second Amended Complaint and Application for Preliminary Injunction filed on May 16, 2006, by Plaintiff Kevin M. Ehringer Enterprises, Inc., d/b/a Data Center Systems ("DCS"). The court also has before it Plaintiff's Motion to Strike Defendant McData Services Corporation's Supplemental Statement of Facts in Opposition to Application for Preliminary Injunction, filed June 26, 2006. Upon consideration of the motions, related briefs, oral hearing held on June 16, 2006, record before the court, and applicable law, the court **denies** Plaintiff's Application for Preliminary Injunction and **denies as moot** Plaintiff's Motion to Strike Defendant McData Services Corporation's Supplemental Statement of Facts in Opposition to Application for Preliminary Injunction.

**I. BACKGROUND**

Plaintiff DCS's Second Amended Complaint and Application for Preliminary Injunction ("Am. Compl.") sets forth two alternative claims: (1) Defendant McData Services Corporation, f/k/a Computer Network Technology Corporation ("McData" or "CNT") breached a valid,

binding contract between the parties; or, alternatively, (2) McData fraudulently induced DCS to enter into this contract with no intention of performing its obligations under the contract. The parties do not dispute the basic facts surrounding the formation of a contract between DCS and CNT.[1] Under the Agreement, DCS would distribute and eventually purchase two product lines from CNT – a Fiber Management System ("FMS") and Intelligent Fiber System ("IFS"), both products used in managing fiber optic data systems and collectively referred to in the Agreement as the "Products." DCS's Am. Compl. at 2; McData's (12)(b)(6) Br. at 3. The Agreement obligated CNT to use its "best efforts" to market and sell the Products, and to transfer all rights to the Products to DCS after DCS had paid at least $1 million in royalties. Agreement, articles 1, 3 (attached as Exhibit A to DCS's Am. Compl.). The Agreement also obligated DCS to use its "best efforts" to market and sell the Products, as well as to produce, distribute, service and upgrade the Products, and to pay the $1 million in royalties within three years, the duration of the Agreement. Agreement, articles 1, 2. Additionally, the Agreement prohibited both parties from directly or indirectly developing, producing, distributing, or marketing products that compete with existing products of the other party. Agreement, articles 2(3)(a), 3(1)(c). DCS's complaint alleges that CNT breached the contract by failing to use its best efforts to market and sell the Products, and by developing, marketing and selling a competing product line, the UCS 2900. *See generally*, DCS's Am. Compl. at 2–19.

---

[1]Defendant McData acquired CNT, which was the predecessor in interest on the contract, titled a "Distributor, Development, Asset Sale, and Reseller Agreement" (referred to as the "Agreement"). Although McData has not answered DCS's complaint, its brief in support of its Rule 12(b)(6) Motion to Dismiss ("McData's 12(b)(6) Br.") acknowledges the Agreement, and its description of some terms matches those set forth by DCS. *See* McData's 12(b)(6) Br. at 3-4.

**Memorandum Opinion and Order – Page 2**

For the purposes of the preliminary injunction, DCS asserted only that it has a substantial likelihood of success on the merits of its breach of contract claim without addressing its fraudulent inducement claim. *See* DCS's Am. Compl. at 20. DCS further narrowed its argument during the preliminary injunction hearing held on June 16, 2006, to the issue of McData's breach of the non-compete provisions of the contract. Preliminary Injunction Hearing Transcript ("Prlim. Inj. Hr'g Tr.") at 24. Accordingly, the court has limited its preliminary injunction analysis to whether DCS has a substantial likelihood of succeeding on the merits of this claim regarding McData's breach of the non-compete provisions of the parties' contract.

### A. Legal Standard

**1. Choice of Law**

At the conclusion of the Preliminary Injunction Hearing on June 16, 2006, the court directed the parties to file supplemental briefs addressing the choice of law issues applicable to this case, since the Agreement contains a choice-of-law provision stating that the law of Minnesota (McData's principal place of business) governs the Agreement. *See* Agreement, article 8(5)(a). After reviewing the parties' briefs, and conducting its own research into matter, the court first determines that federal law governs the standards for issuing a preliminary injunction in accordance with Fed. R. Civ. P. 65. Next, the court notes that, in a diversity case such as this, a federal court applies the choice of law rules of the state in which it sits. *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 452 n.2 (5th Cir. 2001); *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995). Accordingly, the court applies Texas choice-of-law rules to determine the applicability or enforceability of the parties' Minnesota contractual choice of law provision.

Under Texas' choice of law rules, "when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Tex. Bus. & Com. Code Ann. § 1.301 (Vernon 2006); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990). In other words, DCS and McData are free to choose that Minnesota law will govern the enforcement and interpretation of their Agreement, including the non-compete provisions of the Agreement, since Minnesota bears a reasonable relation to the transaction as McData's principal place of business. McData argues that Texas views unreasonable non-compete provisions as void as against Texas public policy, and, therefore, Texas law should be applied to determine whether the non-compete provision in the Agreement is void under Texas law. McData's Suppl. Br. in Opp'n to Application for Prelim. Inj. (McData's "Suppl. Prelim. Inj. Br.") at 4–5. McData argues that, under Texas law, the non-compete provision in the Agreement would be unreasonable and unenforceable. *Id.* at 5. The court, at this point, disagrees with McData for several reasons.

First, McData drafted the contract (and presumably the provision) it now wants the court to hold unreasonable. *See* Prelim. Inj. Hr'g Tr. at 75. Second, the court is not convinced by McData's arguments that the non-compete provision is overbroad or unreasonable, since the identical provision is repeated twice in the Agreement, as an equal obligation for each party, and appears ancillary to an otherwise valid transaction that is limited in scope by time and geography.[2] Third, under Texas law, courts must honor choice-of-law provisions agreed to by

---

[2]The parties do not dispute that the non-compete is ancillary to an otherwise valid agreement, even though McData argues that the non-compete is unreasonable under Texas standards. *See* McData's Suppl. Prelim. Inj. Br. at 4-5. . The primary purpose of the Agreement involves the joint sales of FMS and IFS products, with an eventual sale of the product lines by McData to DCS. *See*, *e.g.*, McData's Suppl. Prelim.

**Memorandum Opinion and Order – Page 4**

parties contracting in a transaction worth $1,000,000 or more, regardless of "whether the application of that law is contrary to a fundamental public policy of this state or of any other jurisdiction.[3]  Tex. Bus. Code. Ann. § 35.51 (Vernon 2006).  Accordingly, the court will apply Minnesota law to its interpretation of the non-compete provisions of the Agreement when analyzing whether DCS has demonstrated a substantial likelihood of success on the merits of its claim alleging breach of the non-compete provisions of the Agreement.

**2. Preliminary Injunction**

There are four prerequisites for the extraordinary relief of a temporary restraining order or preliminary injunction.  To prevail, Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of immediate and irreparable harm, for which he has no adequate remedy at law; (3) that greater injury will result from denying the temporary restraining order than from its being granted; and (4) that a temporary restraining order will not disserve the public interest.  *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*).  The party seeking such relief must

---

Inj. Br. at 3.  Two non-compete provisions in the Agreement are identical, except for the party named as the obligor: "[DCS/CNT] will not, either directly or indirectly, develop, produce, distribute, or market products that are competitive with existing [CNT/DCS] products."  Agreement, articles 2(3)(a), 3(1)(c).  A separate term notes that "CNT agrees it will not buy or sell products in North America which directly compete with the products."  Agreement, article 1(2)(c)(i).  Furthermore, the terms of the Agreement set forth a three-year, cooperative, but terminable, relationship.  Agreement, article 1 (5).

[3]Specifically, the Business Code states: "[I]f the parties to a qualified transaction [worth $1,000,000 or more] agree in writing that the law of a particular jurisdiction governs an issue relating to the transaction, including the validity or enforceability of an agreement relating to the transaction or a provision of the agreement, and the transaction bears a reasonable relation to that jurisdiction, the law, other than conflict of laws rules, of that jurisdiction governs the issue regardless of whether the application of that law is contrary to a fundamental public policy of this state or of any other jurisdiction."  Tex. Bus. & Com. Code Ann. § 35.51 (Vernon 2002).

**Memorandum Opinion and Order – Page 5**

satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted. *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the temporary restraining order or preliminary injunction.

### B. Analysis

DCS asserts that McData breached the non-compete provisions of the Agreement by promoting and selling a competing product line, the UCS 2900, and by purchasing FMS and IFS products from DCS's competitors. *See* Plaintiff's Brief in Support of Application for Preliminary Injunction (DCS's "Prelim. Inj. Br.") at 10–12; DCS's Suppl. Prelim. Inj. Br. at 7–9. McData argues that it has not violated these non-compete provisions because the 2900 line does not compete with DCS's FMS and IFS lines, and that it has not purchased products that competed with "existing DCS products." Defendant McData's Brief in Opposition to Application for Preliminary Injunction (McData's "Prelim. Inj. Br.") at 8–11. Further, McData argues that DCS cannot show a substantial likelihood of success on the merits, because another provision of the Agreement, limiting the types of damages recoverable by the parties in the event of a dispute, bars "the very damages it seeks to recover in this suit." *Id.* at 11. The court finds this last argument by McData controlling in this analysis on DCS's likelihood of success on the merits.

Article 8 of the Agreement sets forth the limitations on remedies and damages in all capital letters:

> a. BOTH PARTIES' LIABILITY FOR LOSS OR DAMAGE ARISING OUT OF THIS AGREEMENT OR IN CONNECTION WITH PRODUCTS PROVIDED UNDER THIS AGREEMENT, REGARDLESS OF THE FORM OF

**Memorandum Opinion and Order – Page 6**

> ACTION, IS LIMITED TO THOSE MEDIATED, ARBITRATED, OR COURT-AWARDED DIRECT DAMAGES OF PERSONAL INJURY, DEATH, OR DAMAGE TO TANGIBLE PROPERTY (EXCLUDING RECORDS OR DATA, STORED ELECTRONICALLY OR OTHERWISE) TO THE EXTENT CAUSED BY THE NEGLIGENCE OR INTENTIONAL WRONGDOING OF THAT PARTIES' EMPLOYEES PERFORMING UNDER THIS AGREEMENT, BUT IN NO EVENT WILL EXCEED THE GREATER OF THE AMOUNT PAID FOR PRODUCT(S) GIVING RISE TO THE CAUSE OF ACTION UNDER THIS AGREEMENT OR $1 MILLION. THE THIRD PARTIES WHOSE SOFTWARE IS EMBEDDED IN THE SOFTWARE HAVE NO LIABILITY TO EITHER PARTY, WHETHER ARISING IN CONTRACT OR TORT OR OUT OF ANY ACTION FOR INFRINGEMENT.
> b.  IN NO EVENT, REGARDLESS OF THE FORM OF THE CAUSE OF ACTION, WILL EITHER PARTY BE LIABLE FOR ANY CLAIMS MADE AGAINST IT BY ANY PARTY, OR FOR ANY CLAIM BY THE OTHER PARTY OR ITS CUSTOMERS FOR LOST PROFITS, LOST SAVINGS, LOSS OF USE, OR LOSS OF OR DAMAGE TO RECORDS OR DATA, OR FOR ANY OTHER DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, EXCEPT FOR THOSE DIRECT DAMAGES SPECIFIED IN THE PRECEDING SECTION, WHETHER SUCH DAMAGES ARE FORESEEABLE AND EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Agreement, article 8(3)(a), (b). McData asserts that, based on these provisions limiting the types of damages recoverable, DCS is not only unlikely to succeed on the merits, it has failed to state a claim for which relief could be granted, because DCS has failed to articulate a recoverable claim. McData's Prelim. Inj. Br. at 11-12; *see also* McData's 12(b)(6) Br. at 4–7. McData asserts that "[a]ll of DCS's alleged damages under its breach of contract claim . . . constitute damages for lost profits as a result of lost sales." McData's 12(b)(6) Br. at 4. "This is the only logical element of damages which Plaintiff could claim and Plaintiff makes no effort to articulate any other form of damages." *Id.* The court agrees that the damages DCS seeks appear to fall squarely within the types of damages limited by the parties' own Agreement. Thus, the court determines that DCS cannot show a substantial likelihood of success on the merits of its breach of contract claim.

**Memorandum Opinion and Order – Page 7**

In a separate Memorandum Opinion and Order, filed November 21, 2006, the court denied McData's 12(b)(6) Motion to Dismiss on the ground that DCS failed to state a breach of contract claim for which relief could be granted. That decision was based in large part on the very high standard 12(b)(6) movants must meet to establish, beyond doubt, that a plaintiff can prove *no* set of facts in support of his claim. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). As DCS has broadly asserted "significant and substantial damages," not just "lost profits," as a result of the alleged breach of contract, the court could not declare that DCS would be unable to recover any type of damages, whatsoever, consistent with the contract provisions. In a motion for preliminary injunction, the burden falls in exactly the opposite direction, and now DCS must show a *substantial* likelihood of its success on the merits. This time, DCS has failed to meet this high standard. DCS does not explain in its briefs related to the preliminary injunction why the damages limitation provision would not bar its recovery in this case. DCS does assert, however, in its brief opposing McData's 12(b)(6) Motion to Dismiss that the provision is not enforceable because it cannot shield McData from intentional, willful or wanton breaches of the Agreement and would be unconscionable if it did. Plaintiff DCS's Brief in Opposition to Defendant McData's Rule 12(b)(6) Motion to Dismiss (DCS's "12(b)(6) Br.") at 7–11. The court finds this argument unpersuasive.

While DCS correctly points out that courts may refuse to enforce exculpatory clauses that purport to release a party from *all* liability for intentional, willful or wanton conduct, the court does not read the limitation provisions of articles 8(3)(a) and (b) as such a broad release. Article 8(3)(a) clearly contemplates personal or property damages resulting from "negligence or intentional wrongdoing," and attempts to limit recovery of such damages to the $1 million value

**Memorandum Opinion and Order – Page 8**

of the contract. Article 8(3)(b) unambiguously bars both parties' recovery for any lost profits, an entirely different category of damages. DCS argues that a $1 million limit on liability for damages "shocks the conscience," and should be held unconscionable and unenforceable on its face; however, the authority cited by DCS holds only that absolute exculpatory clauses releasing a party from all liability for intentional, willful or wanton acts violate public policy. *See Honeywell, Inc. v. Ruby Tuesday, Inc.*, 43 F. Supp. 2d 1074, 1079 (D. Minn. 1999). Furthermore, DCS acknowledges that "[a] determination of whether McData's conduct in breaching the Agreement was intentional, willful or wanton is an issue of fact that must be decided by the jury." DCS's 12(b)(6) Br. at 10. This court agrees that it lacks the facts necessary to hold that McData's conduct was intentional, willful or wanton, or that the damages limitations provisions in the Agreement are void as a matter of law. Based on the facts before the court, the damages limitations appear likely to bar DCS from recovering any damages for lost profits, which would preclude DCS from succeeding on the merits of its claim, even if DCS shows that McData breached the Agreement.[4] Accordingly, the court must **deny** DCS's application for a preliminary injunction.

## II.  CONCLUSION

For the reasons stated above, the court **determines** that DCS has failed to meet the high standards required for the issuance of a preliminary injunction. Therefore, Plaintiff's Application for Preliminary Injunction is **denied**. Additionally, Plaintiff's Motion to Strike

---

[4]Since DCS cannot prevail on its application for preliminary injunction if it fails to satisfy any one of the four requirements cited earlier, the court need not address the other requirements for preliminary injunction.

**Memorandum Opinion and Order – Page 9**

Defendant McData Services Corporation's Supplemental Statement of Fact in Opposition to Application for Preliminary Injunction is **denied as moot**.

**It is so ordered** this 27th day of November, 2006.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge