IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **KEVIN M. EHRINGER ENTERPRISES INC. d/b/a DATA CENTER SYSTEMS,** | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. **3:06-CV-812-L** |
| **MCDATA SERVICES CORPORATION, f/k/a COMPUTER NETWORK TECHNOLOGY CORPORATION,** | § § § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the court are: (1) Plaintiff's Motion for Judgment as a Matter of Law with Respect to CNT's Defensive Theories, filed September 1, 2009; (2) Defendant's Motion for Judgment as a Matter of Law, filed September 1, 2009; (3) Plaintiff's Motion for Entry of Final Judgment, filed September 8, 2009; and (4) Defendant's Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for New Trial, filed September 28, 2009. After consideration of the motions, responses, replies, briefs, record, and applicable law, the court **denies as moot** Plaintiff's Motion for Judgment as a Matter of Law with Respect to CNT's Defensive Theories and **denies as moot** Defendant's Motion for Judgment as a Matter of Law. The court **grants** Plaintiff's Motion for Entry of Final Judgment and **denies** Defendant's Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for New Trial.

**I.      Background**

Plaintiff Kevin M. Ehringer Enterprises Inc. d/b/a Data Center Systems ("Plaintiff" or "DCS") brought claims for breach of contract and fraudulent inducement against Defendant McData

Services Corporation, f/k/a Computer Network Technology Corporation ("McData") through its Second Amended Complaint on May 16, 2006. The court granted partial summary judgment for McData on Plaintiff's breach of contract claim on March 4, 2009. On August 24, 2009, the court commenced a two-phase jury trial on the fraudulent inducement claim. DCS and McData each filed a motion for judgment as a matter of law at the close of evidence on September 1, 2009; the court made no ruling on those motions.

At the end of the trial's first phase, on September 2, 2009, the jury found for DCS and rejected McData's ratification defense, awarding $10,530,000 in past damages and $2,000,000 in future damages, totaling $12,530,000 in compensatory damages. At the end of the second phase, on September 3, 2009, the jury declined to award any punitive damages. On September 8, 2009, Plaintiff filed a motion for judgment on the verdict. McData responded with a renewed motion for judgment as a matter of law on September 28, 2009, asking the court to overturn the jury's verdict. The undisputed facts regarding the contract between the parties and the terms therein have been fully set forth in the court's March 4, 2009 memorandum opinion and order and are hereby incorporated by reference.

## II.     Standard of Review for Judgment as a Matter of Law

Judgment as a matter of law is proper where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party." Fed. R. Civ. P. 50(a)(1). The court must review all of the evidence in the record and "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Judgment as a matter of law should be granted only "if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Coffel v. Stryker Corp.*, 384 F.3d 625, 630 (5th Cir. 2002); *see also Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296

**Memorandum Opinion and Order – Page 2**

(5th Cir. 2005). Thus, a jury verdict must be upheld unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 296-97 (internal quotations omitted). A court must test the sufficiency of the evidence under the standard enunciated in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (*en banc*), *overruled on unrelated grounds, Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 336-38 (5th Cir. 1997) (*en banc*); *Casarez v. Burlington Northern Santa Fe Co.*, 193 F.3d 334, 336 (5th Cir. 1999). Under *Boeing*, "[t]here must be a conflict in substantial evidence to create a jury question." 411 F.2d at 375. Substantial evidence is "evidence of such quality and weight that reasonable and fairminded [persons] in the exercise of impartial judgment might reach different conclusions." *Id*. at 374; *see also Krystek v. University of Southern Miss.*, 164 F.3d 251, 255 (5th Cir. 1999).

**III.    Analysis**

    **A.    Preverdict Motions – Plaintiff's Motion for Judgment as a Matter of Law with Respect to CNT's Defensive Theories; Defendant's Motion for Judgment as a Matter of Law**

Because the trial proceeded to jury deliberations and a jury verdict was ultimately reached, the preverdict motions filed by the parties on September 1, 2009, are in effect mooted. DCS's motion made a request for the court not to submit McData's ratification defense to the jury. The court allowed the jury to consider this defense, and the jury ruled in DCS's favor. After the jury returned its verdict, McData renewed its motion for judgment as a matter of law by filing a new motion. The court will accordingly turn its analysis to the postverdict motions filed by DCS on September 8, 2009, and filed by McData on September 28, 2009.

B.  **Postverdict Motions – Plaintiff's Motion for Entry of Final Judgment; Defendant's Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for New Trial**

The postverdict motions, respectively filed by DCS and McData, are essentially cross-motions for judgment. DCS asks the court to enter the jury's verdict, and McData renews its motion for judgment as a matter of law, asking the court to vacate the jury's verdict. The motions, therefore, are rightly considered together. In its motion, McData argues that the damages awarded by the jury are for lost profits, a remedy barred under a limitation of remedies provision within the contract. McData further argues that DCS's fraudulent inducement claim is nothing more than a converted form of its original breach of contract claim, which the court already dismissed when it granted partial summary judgment. The court will address both of these arguments in turn.

1.  **Limitation of Remedies**

In support of its argument that the remedy of lost profits is barred, McData relies on contractual language that specifies, "[i]n no event, regardless of the form of the cause of action, will either party be liable for any claims made against it by any party, or for any claim by the other party or its customers for lost profits . . . ." PX 3, Art. 8.3(b). McData contends that this provision was intended by the parties when they entered the agreement and was part of the bargain. McData further contends that, by its plain language, this provision attaches to any cause of action, including a fraudulent inducement claim, and cannot be ignored without a showing that the remedies limitation provision *itself* was fraudulently induced.

DCS responds that McData's contention skips over the narrow scope of the remedies limitation clause, which applies only to losses "arising out of this Agreement or in connection with products provided under this Agreement." *Id.* Art. 8.3(a). DCS argues that fraudulent inducement is a claim that falls outside this narrow scope. In reply, McData cites to the record to demonstrate

**Memorandum Opinion and Order – Page 4**

that DCS's fraudulent inducement pleadings arose solely from the Agreement, establishing that it was the *terms* of the Agreement itself that gave rise to DCS's fraudulent inducement claim. McData urges that, for a fraudulent inducement claim to stand, there must have been a misrepresentation independent of the contract that occurred before the contract was signed. Because the misrepresentation at issue here is not "independent of the contract," McData contends that DCS's fraudulent inducement claim fails as a matter of law.

Under Texas law, a plaintiff establishes a fraudulent inducement claim by showing the elements of a simple fraud claim. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 480 (5th Cir. 2000). To establish fraud, a plaintiff must show that: (1) a material representation was made; (2) the representation was false; (3) the speaker knew the representation was false when made or made the representation recklessly without any knowledge of its truth as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Lane v. Halliburten*, 529 F.3d 548, 564 (5th Cir. 2008) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)). Further, a promise of future performance constitutes actionable fraud only if "the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Notably, the court's research revealed no authority imposing a requirement that such a misrepresentation must occur independent of the contract terms.[*]

---

[*]The court did locate authority indicating that fraudulent conduct must give rise to liability independent of contract for an action to sound in fraud instead of breach of contract. *See Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 258 F.3d 345, 352 (5th Cir. 2001). Here, however, the misrepresentation was the proposed contract terms themselves, coupled with McData's lack of intent to perform. That the contract was then executed and its terms later breached has no bearing on the liability incurred by McData for lacking intent, at the time of execution, to perform its obligations under the contract.

**Memorandum Opinion and Order – Page 5**

While it is implicit that the misrepresentation forming the substance of a fraudulent inducement claim must have occurred before the contract's execution to have "induced," the court sees no reason why such a misrepresentation cannot encompass the terms of the contract itself. Ostensibly, parties to a contract read the terms of the agreement before affixing their signatures to it. After reading through a contract, and finding its terms to their liking, the parties sign the agreement, which executes the contract, with the intention that the terms be carried out as written. If one party has no intention of carrying out its obligations under the contract at the time of execution, fraudulent inducement has occurred because the party never intended to fulfill its end of the bargain and used the contract terms solely to induce the other's signature.

Such a scenario differs significantly from a mere breach of contract in which the breaching party initially intended to meet its obligations under the terms of the agreement at the time of execution and subsequently fell short of fulfilling those obligations. When a party from the outset never intends to fulfill its obligations, however, the resulting fraudulent inducement claim cannot be said to "arise from the agreement" because, in essence, there is no agreement. To clarify, if one party never intends to fulfill its contractual obligations, it is merely making a future fraudulent promise in an attempt to wrongfully bind the other to something to which the parties did not agree. The party acting fraudulently knows that the other would never agree to the contract's terms if such party were made aware of the other party's intent not to perform. Such inducement renders the agreement itself fraudulent and unenforceable with respect to a provision that would bar recovery for a fraudulent inducement claim "arising out of the agreement" because such a claim covers conduct that was not contemplated by the agreement, namely, a lack of intent to perform. Accordingly, the court finds unpersuasive McData's argument that DCS's fraudulent inducement claim is barred because it involved the terms of the agreement.

**Memorandum Opinion and Order – Page 6**

McData next asserts that DCS must prove that the limitations of remedies provision *itself* was fraudulently induced for its terms to be avoided. In support of this argument, McData cites cases where courts enforced dispute resolution contract provisions even when the contract was induced by fraud, absent a showing that the specific dispute resolution clause was induced by fraud. Examples of such provisions include arbitration clauses, forum selection clauses, waiver of reliance on representation clauses, and clauses waiving the right to a jury trial. McData provided the court with cases enforcing each of these clauses within the context of a fraudulently induced contract, arguing that the remedies limitation provision at issue here should be treated no differently. Notably, however, McData provided no authority in which a court enforced a clause similar to the remedies limitation provision here within the same context.

The court finds that enforcement of the remedies limitation clause in this case is not supported by existing law, irrespective of whether DCS is capable of showing that the clause itself was fraudulently induced. Although McData provides examples of dispute resolution clauses being enforced within the context of a fraudulently induced contract, McData's argument fails to account for the resulting lack of a remedy in this case if the clause were to be enforced. The cases relied upon by McData are inapposite. Rather than deny the remedy outright, these cases merely modify the *form* of remedy available. While the form of remedy—such as arbitration or a bench trial—may be contrary to what the fraudulently induced party wanted in those cases, the party was nevertheless afforded a *remedy*. Accepting McData's interpretation of the applicable law, applied to the remedies limitation clause here, strips DCS of any remedy with respect to its fraudulent inducement claim and allows the wrongdoer to profit from its independent tortious conduct. This produces an absurd result.

**Memorandum Opinion and Order – Page 7**

Rarely do those who engage in fraudulent conduct publicize it. While legal legerdemain may be a common practice in the negotiation of a contract, it does not grant one party a license to commit fraud. The court cannot allow a party to insulate itself from liability for fraudulent conduct by inserting a contractual provision and concealing its intention not to perform. While McData contends that the remedies limitation clause here precludes DCS's recovery for fraudulent inducement, Texas law holds to the contrary.[2] Under Texas law, a party who is induced by fraud to enter into a contract has a *selection* of remedies available; the party may stand to the bargain and recover damages for the fraud, as here, or the party may rescind the contract, returning the thing bought and receiving back what was paid. *Perenco Nigeria Ltd. v. Ashland Inc.*, 242 F.3d 299, 307 (5th Cir. 2001); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676-77 (Tex. 2000). In no event does such law even intimate that the party who has been fraudulently induced should be *stripped* of remedy.

Finally, McData argues that DCS's fraudulent inducement claim is barred because DCS affirmed the contract by suing for its breach, thereby ratifying the contract. In support, McData directs the court to a Fifth Circuit case in which the court stated that the party was bound to a contract's limitation of remedies clause, similar to the one here, when that party affirmed the contract and sued for breach. Def.'s Renewed Mot. for J. Br. at 4-5 (discussing *Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781 (5th Cir. 1973)). In *Fredonia*, the case went to trial and the jury found that the fraudulently induced party had affirmed the contract. *Fredonia*, 481 F.2d at 791. The Fifth Circuit did not determine that the fraudulently induced party affirmed the contract solely because it sued for breach; the court actually discussed at length that a breach of contract

---

[2]The parties do not dispute that Texas law controls DCS's fraudulent inducement claim.

**Memorandum Opinion and Order – Page 8**

claim and a fraudulent inducement claim could proceed simultaneously and that a judgment on both claims could stand. *See id.* at 790-91. The court, therefore, placed great weight on the jury's findings in its determination that the contract had been affirmed.

In this case, however, the jury specifically rejected McData's contract affirmation defense at trial. The court accordingly has no basis for finding that DCS affirmed the contract upon its discovery of the fraudulent inducement. Whether the contract had been affirmed was a question for the trier of fact to decide, and the trier of fact has made its determination. The contract was not affirmed, and the limitation of remedies provision is inapplicable to DCS's fraudulent inducement claim.

### 2. Conversion of Contract into Tort

McData argues that DCS's fraudulent inducement claim is nothing more than an attempt to convert a contract claim into a tort and serves as an impermissible scheme under the law to avoid the remedies limitation provision of the contract. McData relies foremost on a 2006 case decided in this district for support. That case involved a fraudulent inducement claim, and the court granted summary judgment for the defendant on that claim. *AMS Staff Leasing, NA, Ltd. v. Associated Contract Truckmen, Inc.*, No. 3:04-CV-1344-D, 2006 WL 1096777, at *5 (N.D. Tex. Apr. 26, 2006). In its analysis, the court reasoned that intent not to perform, standing alone, was insufficient to withstand summary judgment. *Id.* at *4. McData asserts that an analogous situation is presented with respect to DCS's fraudulent inducement claim in this case and relies on the following language from the *AMS Staff Leasing* decision:

> Essentially, [the plaintiff's] fraudulent inducement cause of action can be reduced to a claim that [the defendant] entered into the Agreements with no intent to perform them. If this were sufficient of itself to prove fraudulent inducement, breach of contract claims could routinely be transformed under Texas law into tort claims. One party

**Memorandum Opinion and Order – Page 9**

> could often be able at least to point to circumstantial evidence that the opposing party did not intend to perform the contract as promised. Texas law avoids this possibility by requiring the claimant to demonstrate intent to deceive through proof of a misrepresentation or omission of a fact that the party had a duty to disclose. The claimant cannot, as [the plaintiff] has effectively done here, merely assert that the opposing party entered into the contract with the intent not to perform it.

*Id.* (citation omitted). McData therefore argues that DCS must show an "intent to deceive" to prevail upon its fraudulent inducement claim, a showing that McData argues DCS has not made. The court finds McData's position unpersuasive.

The court reads *AMS Staff Leasing* as an accurate statement of the law. It is true that a mere assertion of the other party's lack of intent to perform is insufficient to sustain a claim for fraudulent inducement; proof of a misrepresentation evidencing such absent intent is also required. In this case, however, there is much more to DCS's claim than mere assertion. At trial, the jury heard and considered an abundance of evidence from which a reasonable jury could find fraudulent inducement. For example, the video deposition of McData Chief Financial Officer Greg Barnum conveyed a demeanor of indifference, even callousness, toward the terms of the contract and the fulfillment of McData's obligations. Mr. Barnum was unable to answer many simple details about the contract, notwithstanding that he personally signed the agreement. McData's former Chief Executive Officer Thomas Hudson, in his video deposition, showed little, if any, interest in the contract and came off as arrogant, dismissive, and stern.[3] The repeated follow-up letters written by Kevin Ehringer after the contract's execution demonstrated DCS's strong apprehension that McData had no intention of meeting, and would never meet, its obligations. The evidence indicated that

---

[3]When Mr. Hudson appeared for his live testimony he was a "changed man." He was affable and engaging, matters which the jury could observe and, during its decision-making process, contrast with his deposition demeanor.

**Memorandum Opinion and Order – Page 10**

McData had made few, if any, preparations to live up to its end of the bargain. Further, DCS presented evidence showing that, when McData agreed to use its best efforts to promote and market the products at the subject of the agreement, McData was already engaged in the development of a new data center product designed to directly compete with the products under the agreement. All of this evidence, coupled with DCS's assertion that McData had no intent to perform its contractual obligations at the time the agreement was executed gives substance to the fraudulent inducement claim.[4]

With respect to McData's argument that DCS must further prove an "intent to deceive" as a separate element to fraudulent inducement, the court is unpersuaded. Deceitfulness exists when a party agrees to perform specified obligations without actually intending to perform them. Where, as here, an entity agrees with another party to be bound to a contract, but at the same time the entity silently and intentionally decides that it will not be bound, then it has deceived the other party, and it intends to so deceive. Such intent is rightfully inferred from competent evidence surrounding and following the agreement that sheds light on the type of misrepresentations made to induce the contract's execution. *See Arete Partners, L.P. v. Gunnerman*, --- F.3d ---, No. 06-51133, 2010 WL 104699, at *3 (5th Cir. Jan. 13, 2010) ("Even 'slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.'") (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). The trier of fact in this case carefully weighed such evidence at trial and determined that fraudulent intent existed at the time the agreement was made, and there is no indication in the record that the evidence was insufficient to draw that conclusion.

---

[4] The court, given its schedule, has not had an opportunity to read the transcript; it relies on its memory and notes taken during trial.

**Memorandum Opinion and Order – Page 11**

McData next argues that its partial performance negates DCS's fraudulent inducement claim, a rule that McData contends exists to guard against conversion of contract claims into torts. Although the court agrees that partial performance can negate an intent not to keep a promise at the time it was made, this rule is not etched in stone. *See IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("Partial performance *can* negate an intent not to keep a promise at the time it was made.") (emphasis added). McData presented evidence of its partial performance under the contract to the trier of fact, and the trier of fact determined that the contract was fraudulently induced. As discussed previously, the court finds that there is sufficient evidence in the record to support such a finding by the jury. Accordingly, the court will not overturn the jury's finding as to McData's lack of intent to perform, notwithstanding that partial performance may have occurred. That such partial performance may have occurred has no bearing on whether McData possessed the requisite fraudulent intent at the time of the contract's execution, and does not necessarily defeat a claim for fraudulent inducement.

Finally, McData argues that the term "best efforts" as used in the agreement is too vague to be enforced. The court does not agree. While true that "best efforts" was not defined under the agreement, such a term would evoke in a reasonable individual the concepts of due diligence and the absence of neglect in undertaking a duty. The jury heard testimony at trial from McData representatives on the topic of McData's understanding of the term "best efforts." As the parties may recall, the court did not allow Mr. Ehringer, or any other DCS representative, to testify as to his understanding of the term. Even if the "best efforts" term is vague to a third party observer, McData was the party that drafted the contract, and the jury was free to rely on the evidence that *McData* provided regarding that term. The court finds it interesting that McData, the drafter of the contract, would now contend that the "best efforts" provision, as understood and explained to the

**Memorandum Opinion and Order – Page 12**

jury by the drafter, is too vague to be enforced. In deliberations, the jury weighed McData's understanding of the term "best efforts"—and the impact the term should have had on McData's ensuing performance—with McData's actual performance. From this, the jury reached the determination that McData had no intention to comport with the "best efforts" provision when the contract was executed.

With respect to exemplary damages, McData argued that DCS cannot recover such damages as a matter of law because exemplary damages are warranted "only when the act is that of the corporation rather than the act of its ordinary servants or agents." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997). Because the jury did not award any exemplary damages, however, this argument is moot, and the court need not address it.

### C.    Motion for New Trial and Additional Briefing

McData contends that it should be granted a new trial. A new trial is warranted when the district court believes that the trial was unfair or that the jury verdict was contrary to the great weight of the evidence. *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005). In light of its above analysis, the court does not believe that any procedural or substantive error has been committed in this case to render the trial unfair. The court further believes that the jury verdict produced in this case was not against the great weight of the evidence; there was ample evidence for a reasonable jury to decide the way it did. Accordingly, a new trial will not be granted.

On November 3, 2009, McData filed correspondence with the court and cited a recent Texas Supreme Court decision, *Aquaplex, Inc. v. Rancho La Valencia, Inc*, 297 S.W.3d 768 (Tex. 2009). McData relies on *Aquaplex* for the proposition that any actionable misrepresentation for a fraudulent inducement claim must be independent of the agreement. After reviewing the *Aquaplex* decision and DCS's response to McData's correspondence, the court determines that *Aquaplex* is an

**Memorandum Opinion and Order – Page 13**

affirmation of Texas law regarding a fraudulent inducement claim. The *Aquaplex* decision applies the same standard that prior Texas and Fifth Circuit authority has applied, and does not alter the court's analysis in this case. As discussed previously, the court does not see why an actionable misrepresentation must arise independent of the *terms* of the agreement.

McData also requests leave to file additional briefing on the damages issue in this case as part of its *Aquaplex* correspondence, turning its attention to language from the *Aquaplex* opinion that reads, "[b]ut the damages cannot be based upon an 'entirely hypothetical, speculative bargain that was never struck and would not have been consummated.'" *Id.* at 776 (quoting *Formosa Plastics*, 960 S.W.2d at 50). The court determines that the ultimate verdict rendered by the jury in this case evidenced a thoughtful trier of fact that was cognizant in deliberations of more than just an "entirely hypothetical, speculative bargain." DCS's original fraudulent inducement claim sought recovery for approximately $65,000,000. The jury awarded $12,000,000, a fraction of the amount originally sought. The jury further elected to award zero punitive damages. This conveys to the court that the damages were critically analyzed, and that the jury did not make an award based upon some nebulous or amorphous business arrangement that never came to fruition. The court determines that additional briefing on this matter is unnecessary and **denies** McData's request for such.

## IV.   Conclusion

For the reasons stated herein, the court **denies as moot** Plaintiff's Motion for Judgment as a Matter of Law with Respect to CNT's Defensive Theories and **denies as moot** Defendant's Motion for Judgment as a Matter of Law. The court **grants** Plaintiff's Motion for Entry of Final Judgment and **denies** Defendant's Renewed Motion for Judgment as a Matter of Law, or in the alternative,

Motion for New Trial. Judgment will issue by separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**It is so ordered** this 25th day of February, 2010.

Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order – Page 15**